B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET (Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER (Court Use Only) |
|---|---|

| PLAINTIFFS<br><br>JASON M. TORF, Liquidating Trustee for TANTUM COMPANIES, LLC | DEFENDANTS<br>TANTUM HOLDINGS, LLC, AXUM CAPITAL PARTNERS, LLC, AETIUS HOLDINGS, LLC, AXUM CAPITAL PARTNERS MANAGEMENT, LLC, AXUM CAPITAL PARTNERS FUND I, LP, MUHSIN MUHAMMAD II, AND DENIS ACKAH-YENSU |
|---|---|
| ATTORNEYS (Firm Name, Address, and Telephone No.)<br>Andrew T. Houston<br>Moon Wright & Houston, PLLC<br>212 N. McDowell Street, Suite 200, Charlotte, NC  28204 | ATTORNEYS (If Known)<br>David M. Schilli<br>Robinson Bradshaw<br>600 S. Tryon St., Suite 2300, Charlotte, NC  28202 |
| PARTY (Check One Box Only)<br>☐ Debtor     ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor   ☐ Other<br>☒ Trustee | PARTY (Check One Box Only)<br>☐ Debtor     ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor   ☒ Other<br>☐ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED) Action: (i) to avoid fraudulent transfers pursuant to 11 U.S.C. §§ 544, 548 and 550, (ii) to avoid and recover  unauthorized post-petition transfers pursuant to 11 U.S.C. §§ 549 and 550, and (iii) and related claims for relief pursuant to 11 U.S.C. §§ 544 and N.C. Gen. Stat. § 75-1.1 et seq.

## NATURE OF SUIT
(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☒ 13-Recovery of money/property - §548 fraudulent transfer
☒ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

(continued next column)

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce/sep property settlement/decree
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – reinstatement of stay
☒ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☒ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $ 3,399,338.98 together with treble damages, costs and fees |
| Other Relief Sought | |

B1040 (FORM 1040) (12/15), Page 2

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR <br> Tantum Companies, LLC | | BANKRUPTCY CASE NO. <br> 23-30407 |
| DISTRICT IN WHICH CASE IS PENDING <br> Western District of NC | DIVISIONAL OFFICE <br> Charlotte | NAME OF JUDGE <br> Laura T. Beyer |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISIONAL OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) <br><br> /s/ Andrew T. Houston | | |
| DATE <br><br> 10/15/2025 | PRINT NAME OF ATTORNEY (OR PLAINTIFF) <br><br> Andrew T. Houston | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located.  Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate.  There also may be lawsuits concerning the debtor's discharge.  If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 104, the Adversary Proceeding Cover Sheet, if it is required by the court.  In some courts, the cover sheet is not required when the adversary proceeding is filed electronically through the court's Case Management/Electronic Case Files (CM/ECF) system.  (CM/ECF captures the information on Form 104 as part of the filing process.)  When completed, the cover sheet summarizes basic information on the adversary proceeding.  The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court.  The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney).  A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs and Defendants.**   Give the names of the plaintiffs and defendants exactly as they appear on the complaint.
**Attorneys.**  Give the names and addresses of the attorneys, if known.
**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.
**Demand.**  Enter the dollar amount being demanded in the complaint.

**Signature.**  This cover sheet must be signed by the attorney of record in the box on the second page of the form.  If the plaintiff is represented by a law firm, a member of the firm must sign.  If the plaintiff is pro se, that is, not presented by an attorney, the plaintiff must sign.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| **In re:** | |
| **TANTUM COMPANIES, LLC,** | Chapter 11 |
| Debtor. | Case No: 23-30407<br>Jointly Administered |
| **JASON M. TORF, Liquidating Trustee for TANTUM COMPANIES, LLC,** | |
| Plaintiff, | |
| **v.** | Adversary Proceeding No.: 25- |
| **TANTUM HOLDINGS, LLC, AXUM CAPITAL PARTNERS, LLC, AETIUS HOLDINGS, LLC, AXUM CAPITAL PARTNERS MANAGEMENT, LLC, AXUM CAPITAL PARTNERS FUND I, LP, MUHSIN MUHAMMAD II, and DENIS ACKAH-YENSU,** | |
| Defendants. | |

**COMPLAINT**

NOW COMES the plaintiff, Jason M. Torf (the "Plaintiff"), not individually but solely in his capacity as the liquidating trustee pursuant to the Liquidating Trust Agreement dated March 1, 2025 (the "Liquidating Trust Agreement"), by and through undersigned counsel, and hereby alleges as follows:

### I. **PARTIES**

1. Plaintiff is the duly appointed liquidating trustee of the liquidating trust created pursuant to the confirmed *Amended Plan of Reorganization of Tantum Companies, LLC* dated September 17, 2024 (the "Plan"), and the terms of the Liquidating Trust Agreement.

1

2. Defendant Tantum Holdings, LLC ("Tantum Holdings") is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in Mecklenburg County, North Carolina.

3. Defendant Axum Capital Partners, LLC ("Axum Capital") is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in Mecklenburg County, North Carolina.

4. Defendant Aetius Holdings, LLC ("Aetius Holdings") is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in Mecklenburg County, North Carolina.

5. Defendant Axum Capital Partners Management, LLC ("Axum Management") is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in Mecklenburg County, North Carolina.

6. Defendant Axum Capital Partners Fund I, LP ("Axum Fund I") is a limited partnership organized and existing under the laws of the State of Delaware, with its principal place of business in Mecklenburg County, North Carolina.

7. Defendant Muhsin Muhammad II ("Mr. Muhammad") is an individual and a resident of Mecklenburg County, North Carolina.

8. Defendant Denis Ackah-Yensu ("Mr. Ackah-Yensu") is an individual and a resident of Mecklenburg County, North Carolina.

9. Tantum Holdings, Axum Capital, Aetius Holdings, Axum Management, Axum Fund I, Mr. Muhammad, and Mr. Ackah-Yensu are referred to herein jointly as the "Defendants." As applicable, Tantum Holdings, Axum Capital, Aetius Holdings, Axum Management, and Axum Fund I are referred to collectively as the "Corporate Defendants."

## II. JURISDICTION AND VENUE

10.     This matter is a core proceeding pursuant to 28 U.S.C. § 157.

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157 and 1334, and Article 12 of the Plan.

12.     The statutory predicates for relief are, among others, 11 U.S.C. §§ 502, 544, 548, 549 and 550.

13.     Venue of this action is proper in this Court pursuant to 28 U.S.C. § 1409(a).

14.     The Plaintiff commences this action pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure.

## III. FACTS

### A. Background Facts Regarding the Debtor and the Chapter 11 Case

15.     Back Yard Burgers is a fast-casual restaurant chain that was originally founded in Cleveland, Mississippi in 1987.

16.     Tantum Companies, LLC ("Tantum," or the "Debtor") is a Delaware limited liability company that was formed in 2017.

17.     Tantum was formed to purchase substantially all of the assets of Back Yard Burgers, Inc. and to operate the Back Yard Burgers restaurants and franchises.

18.     From 2017 through the present, the Debtor has operated Back Yard Burgers restaurants, and has collected royalties and licensing fees from certain non-debtor entities that operate Back Yard Burgers' franchises.

19.     The Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on June 26, 2023 (the "Petition Date").

20. The Debtor filed its Plan on or about September 17, 2024. [Case No. 23-30407, Doc. 346].

21. The Plan provided that a liquidating trust would be formed on the Plan's Effective Date to, among other things, administer assets for the benefit of Tantum's unsecured creditors, investigate and pursue causes of action, review and object to claims, and make distributions. *See*, *e.g*., Plan §§ 3.5, 5.1-5.4, & 8.2.

22. The Plan further provided that, as of the Effective Date, the Plaintiff would be appointed as the representative of the liquidating trust and the bankruptcy estate to pursue causes of action and litigation for the benefit of the Debtor's unsecured creditors. *See, e.g*., *Plan* § 5.4; *Liquidating Trust Agreement* § 3.2.

23. On December 12, 2024, this Court entered an Order confirming the Debtor's Plan.

24. The Debtor filed its *Notice of Effective Date* and declared a March 1, 2025 Effective Date. [Case No. 23-30407, Doc. 395].

### B. Relationship between the Debtor and the Defendants and the Management of the Debtor

25. From its inception through the present, the Debtor has been owned, operated, managed and controlled by Mr. Ackah-Yensu and Mr. Muhammad. At all relevant times, Mr. Ackah-Yensu and Mr. Muhammad served as managers, officers and directors of the Debtor. During the same time period, Mr. Ackah-Yensu and Mr. Muhammad also managed, owned and controlled the other Corporate Defendants as discussed below.

26. **Tantum Holdings**: Tantum Holdings is a Delaware limited liability company, owning 100% of the Debtor's membership interests. At all relevant times, Mr. Muhammad and Mr. Ackah-Yensu managed and controlled Tantum Holdings. Tantum Holdings is a holding company that conducts no business or operations. Tantum Holdings reports the Debtor's income

and losses on its federal tax returns.  Mr. Ackah-Yensu is the tax matters partner who executes the state and federal income tax returns related to the Debtor's operations.

27.    **Axum Capital**: Axum Capital is a Delaware limited liability company that is an affiliate of the Debtor through common ownership and management.  At all relevant times, Mr. Muhammad and Mr. Ackah-Yensu managed, owned and controlled Axum Capital.  Further, the Debtor and all of the Corporate Defendants are operated from a common headquarters and corporate office leased by Axum Capital.

28.    **Aetius Holdings**: Aetius Holdings is a Delaware limited liability company that is an affiliate of the Debtor through common ownership and management.  Aetius Holdings owns Aetius Companies, LLC and a series of subsidiaries (collectively, the "Aetius Debtors") that are currently in their own jointly administered chapter 11 proceedings pending before this Court in the case captioned *In re: Aetius Companies, LLC et al*., case number 23-30470 (W.D.N.C. 2023)(jointly administered).  The Aetius Debtors own and operate the restaurant chain Wild Wings Café at various locations.  At all relevant times, Mr. Muhammad and Mr. Ackah-Yensu managed and controlled Aetius Holdings.  Aetius Holdings is owned by defendant Axum Fund I and two other entities owned and controlled by Mr. Muhammad and Mr. Ackah-Yensu.

29.    **Axum Management**: Axum Management is a Delaware limited liability company that is an affiliate of the Debtor through common ownership and management.  At all relevant times, Mr. Muhammad and Mr. Ackah-Yensu managed, owned and controlled Axum Management.   Upon information and belief, Axum Management contends it provides management services to the Debtor and the Aetius Debtors.

30.    **Axum Fund I**: Axum Fund I is a Delaware limited partnership that is an affiliate of the Debtor through common management and its majority indirect ownership of the Debtor.

At all relevant times, Axum Fund I was the majority owner of Tantum Holdings (and thereby the Debtor) owning between 70% and 100% of its membership interests.  Mr. Muhammad and Mr. Ackah-Yensu are partners and owners of Axum Find I, and they also operate, manage and control Axum Fund I.

### C.  The Debtor's Historically Poor Financial Performance

31.     From its inception, the Debtor's financial performance was extremely poor and its continued operations were untenable.

32.     Nevertheless, the Debtor continued to operate its business prior to the Petition Date while it was: (i) consistently insolvent and undercapitalized, (ii) frequently failing to pay its debts when they came due in the ordinary course of business, (iii) operating at substantial losses during each fiscal year, and (iv) routinely failing to pay its state sales and use taxes and its federal payroll tax obligations.

33.     The Plaintiff addresses each of these points below in turn.

### D.  The Debtor's Historical Operations

34.     From its inception through the date of its bankruptcy filing, the Debtor operated at substantial losses and regularly failed to pay its operating expenses and vendors in the ordinary course of business.

35.     Specifically, the Debtor's audited financial statements and tax returns show that the company operated at a loss at all relevant times prior to the Petition Date as summarized below:

| Fiscal Year Ending | Operating Losses |
| --- | --- |
| 2017 | ($516,437) |
| 2018 | ($1,251,380) |
| 2019 | ($2,292,282) |
| 2020 | ($1,091,893) |
| 2021 | ($3,138,295) |

| 2022 | ($7,412,616) |
| 2023 | ($4,864,404) |

36.     During this same time period, and consistent with its operational shortfalls, the Debtor routinely failed to pay its vendors and operating expenses when they came due in the ordinary course of business.

37.     Consequently, the Debtor's accounts payable and accrued and unpaid expenses grew substantially over this time period.  For example, the Debtor's accrued and unpaid expenses were approximately $1,260,000.00 as of the end of December 2017 and they grew to approximately $5,670,000.00 by the end of December 2022.  The Debtor's accrued and unpaid expenses continued to grow during 2023 and totaled approximately $8,100,000.00 as of the end of December 2023.

### E.  The Debtor's Historical Failure to Pay Taxes

38.     The Debtor historically and consistently failed to pay sales and use taxes, federal payroll taxes and other taxes owed to governmental authorities when they were due prior to the Petition Date.

39.     Starting in 2018, the Debtor routinely failed to pay sales and use taxes owed to the Tennessee Department of Revenue ("TN DOR") and the Mississippi Department of Revenue ("MS DOR") related to the operations of Back Yard Burgers restaurants in those states.

40.     As of the end of December 2019, the Debtor owed the MS DOR and TN DOR a total of $733,000.00 for unpaid sales and use taxes from prior years.

41.     In 2020 and 2021, the Debtor failed to pay federal payroll taxes due and owing to the Internal Revenue Service ("IRS") for the periods covering September 30, 2020 through February 22, 2021 in the amount of $162,446.81.

MWH: 10800.001; 00031375.5

7

42.     The IRS filed a proof of claim in this bankruptcy case in the amount of $206,214.78 related to the unpaid 2020 and 2021 payroll taxes as these taxes remained unpaid as of the Petition Date.  *See*, Claim 8-1.

43.     In 2022, the Debtor failed to pay sales and use taxes owed to the North Carolina Department of Revenue ("NC DOR") related to the operations of Back Yard Burgers restaurants in North Carolina.

44.     The NC DOR filed a proof of claim in this bankruptcy case in the amount of $74,844.03 as these taxes remained unpaid as of the Petition Date.  *See*, Claim 35-1.

45.     The Debtor's bankruptcy schedules filed in this case show that, as of the Petition Date, the Debtor owed $1,380,685.35 in unpaid priority tax claims including the debts owed to the IRS, TN DOR, and MS DOR (ECF No. 211, pp. 3 & 15-17).

### F.  The Debtor's Primary Lending Facilities and its Insolvency and Undercapitalization

46.     The Debtor was insolvent and undercapitalized from its inception and it continued to borrow money that it had no ability to repay based on its poor financial performance and condition.

47.     On or about September 19, 2017, the Debtor borrowed funds from Woodforest National Bank to, among other things, fund its acquisition of the assets of Back Yard Burgers Inc. and operate the business (the "Woodforest Loans").

48.     Pursuant to the Woodforest Loans, the Debtor borrowed funds in the aggregate stated principal amount of up to $6,300,000.00.

49.     Pursuant to a Security Agreement dated September 19, 2017, the Debtor pledged virtually all of its assets as collateral to secure the repayment of the Woodforest Loans.

50.    As of September 17, 2017, and at all relevant times thereafter, the fair market value of the Debtor's assets was less than the amount of the Woodforest Loans.

51.    Almost immediately after borrowing funds from Woodforest Bank, the Debtor needed to restructure the payment terms of the Woodforest Loans given its poor financial performance and the Woodforest Loans were modified multiple times within the first year of the lending relationship.

52.    On December 8, 2020, the Debtor borrowed $10,400,000.00 from Guaranty Bank & Trust Company ("Guaranty Bank") to, among other things, refinance the Woodforest Loans and pay certain specified permitted indebtedness defined in the loan documents (the "Guaranty Bank Loan").

53.    The Guaranty Bank Loan was made pursuant to the federal government's "Mainstreet Lending Program" and the loan was, in substance, owned by the federal government and serviced by Guaranty Bank.

54.    Pursuant to a Security Agreement dated December 8, 2020, the Debtor pledged virtually all of its assets as collateral to secure the repayment of the Guaranty Bank Loan.

55.    As of December 8, 2020 and at all relevant times thereafter, the fair market value of the Debtor's assets was less than the amount of the Guaranty Bank Loan.

56.    The Guaranty Bank Loan was fully funded on or about December 8, 2020, and the proceeds were used to satisfy the Woodforest Loans and certain closing costs in the amount of approximately $5,100,000.00.

57.    The remaining balance of the Guaranty Bank Loan totaling approximately $5,300,000.00 was deposited into the Debtor's account at Guaranty Bank bearing the account number ending in 0122.  As discussed in section H below, substantial portions of the Guaranty

Bank Loan proceeds were siphoned off by the Defendants through a series of surreptitious multi-bank transfers.

58.     The Debtor had no ability to repay the Guaranty Bank Loan when it incurred this substantial liability in December 2020.

59.     Despite its historically poor financial performance, the Debtor continued to fund its losses by borrowing substantial sums from lenders that it had no practical ability to repay, driving the company further in debt.  A summary of the Debtor's historical banking and debt financing structure is set forth in the chart below:

| Fiscal Year Ending | Balance of Bank Debt/Loans |
|---|---|
| 2017 | $3,838,497 |
| 2018 | $6,851,094 |
| 2019 | $7,235,581 |
| 2020 | $11,016,529 |
| 2021 | $13,063,553 |
| 2022 | $14,794,037 |
| 2023 | $14,689,826 |

### G.  The Challenged Transactions

60.     As alleged above, the Debtor's financial performance from its inception was precarious and extremely poor.

61.     According to its own books and records, it ran at operating losses from its inception through the Petition Date.  It was always insolvent and undercapitalized.

62.     Moreover, from its inception through the Petition Date, the Debtor routinely failed to pay its debts as and when they came due in the ordinary course of business including its taxes, expenses owed to the Debtor's primary food vendors, service providers and lenders.

63.     Nevertheless, the Debtor—at the direction and under the control of Mr. Ackah-Yensu and Mr. Muhammad—engaged in a systematic common scheme of siphoning off funds

and assets for the benefit of the Defendants through a series of undocumented and concealed transactions designed to benefit the Defendants to the detriment of the Debtor's creditors.

64. Based upon the information obtained by the Plaintiff to date, the Debtor transferred at least $3,399,338.98 to and for the benefit of the Defendants as part of this common scheme to siphon off assets and funds of the Debtor for the Defendants' benefit in the ten (10) years prior to the Petition Date.

65. Attached hereto as Exhibit 1 is a chart identifying the transfers made to or for the benefit of the Defendants pursuant to this common scheme. Exhibit 1 is incorporated by reference as if set forth fully herein.[1]

66. Upon information and belief, the Defendants subsequently transferred these funds to Mr. Ackah-Yensu and Mr. Muhammad and other entities they own and control.

67. The Debtor failed to receive reasonably equivalent value in exchange for the transfers made pursuant to this common scheme and identified in Exhibit 1.

### H. Pre-Petition Concealment and Surreptitious Transactions

68. Prior to the Debtor's bankruptcy filing, and as part of this common scheme, the Defendants engaged in a number of actions that served to conceal the transactions the Debtor entered into with the Defendants to avoid detection by creditors.

69. For example, the Debtor made transfers of funds to the Defendants and insiders by including them as accounts payable in the Debtor's accounting systems and accounting software to disguise the nature of the payments.

---

[1] As used herein, the following terms have the following meanings: (i) "Ten Year Transfers" refers to all transfers listed on Exhibit 1 that were made within ten (10) years of the Petition Date; (ii) "Four Year Transfers" refers to all transfers listed on Exhibit 1 that were made within four (4) years of the Petition Date, and (iii) "Two Year Transfers" refers to all transfers listed on Exhibit 1 that were made within two (2) years of the Petition Date.

70.     Prior to the Petition Date, the Debtor used various electronic accounting systems and accounts payable software platforms to record its financial/accounting data and transactions.

71.     Among other things, the Debtor used Sage accounting software, NetSuite business accounting software, and bill.com accounts payable software in connection with its pre-bankruptcy operations.

72.     To conceal the nature of its pre-petition transactions, the Debtor—while under the control of Mr. Ackah-Yensu and Mr. Muhammad—discontinued using each of these accounting and accounts payable platforms and failed to make complete backups or preserve the financial records and data related to the Debtor's pre-petition transactions with the Defendants.

73.     To further conceal the nature of its pre-petition transactions with the Defendants, the Debtor entered into a number of overly complicated banking transactions designed to siphon off funds of the Debtor to the Defendants while avoiding detection.

74.     During the course of the Plaintiff's investigation into the Debtor's financial affairs and its transactions with insiders, the Plaintiff has discovered at least 55 separate checking accounts at five banks that the Debtor used during the approximately four years leading up to its bankruptcy filing.  Mr. Ackah-Yensu was the signatory on all of these accounts.

75.     Upon information and belief, the Debtor likely owned or used additional bank accounts that the Plaintiff has not discovered as of the filing of this adversary proceeding.

76.     Prior to the Petition Date, the Debtor engaged in multiple surreptitious transactions where it transferred funds through many of these accounts to ultimately transfer the funds to one or more of the Defendants.

77.     For example, the proceeds of the Guaranty Bank Loan totaling more than $5.3 million dollars were deposited into the Debtor's Guaranty Bank account ending 0122 on December 14, 2020.

78.     On December 18, 2020, the Debtor wired the sum of $800,000.00 from its Guaranty Bank account ending 0122 to the Debtor's Regions Bank account ending 8072.  The next business day (December 21, 2020), the Debtor wired the sum of $412,000.00 from its Regions Bank account ending 8072 to Axum Fund I's account at JPMorgan Chase Bank, N.A.

79.     On November 24, 2021, the Debtor wired the sum of $180,000.00 from its Guaranty Bank account ending 0122 to the Debtor's Regions Bank account ending 8072.  The same day, the Debtor wired the sum of $180,000.00 from its Regions Bank account ending 8072 to Axum Fund I's account at JPMorgan Chase Bank, N.A.

80.     On December 15, 2021, the Debtor wired the sum of $300,000.00 from its Guaranty Bank account ending 0122 to the Debtor's Regions Bank account ending 8072.  The next day (December 16, 2021), the Debtor wired the sum of $300,000.00 from its Regions Bank account ending 8072 to Axum Fund I's account at JPMorgan Chase Bank, N.A.

81.     On December 21, 2021, the Debtor wired the sum of $126,000.00 from its Guaranty Bank account ending 0122 to the Debtor's Regions Bank account ending 8072.  Two days later (December 23, 2021), the Debtor wired the sum of $126,000.00 from its Regions Bank account ending 8072 to Axum Fund I's account at JPMorgan Chase Bank, N.A.

82.     On March 10, 2022, the Debtor wired the sum of $200,000.00 from its Guaranty Bank account ending 0122 to the Debtor's Regions Bank account ending 8072.  The same day, the Debtor wired the sum of $200,000.00 from its Regions Bank account ending 8072 to Axum Fund I's account at JPMorgan Chase Bank, N.A.

83.     On July 12, 2022, the Debtor wired the sum of $100,000.00 from its Guaranty Bank account ending 0122 to the Debtor's Regions Bank account ending 8072.  The next day (July 13, 2022), the Debtor wired the sum of $101,000.00 from its Regions Bank account ending 8072 to Axum Fund I's account at JPMorgan Chase Bank, N.A.

84.     On August 29, 2022, the Debtor wired the sum of $175,000.00 from its Guaranty Bank account ending 0122 to the Debtor's Regions Bank account ending 8072.  The same day, the Debtor wired the sum of $175,000.00 from its Regions Bank account ending 8072 to Axum Fund I's account at JPMorgan Chase Bank, N.A.

85.     The Debtor entered into multiple other transactions following this same pattern of transferring substantial sums of money through various bank accounts on the same day to funnel money to the Defendants to conceal the transactions from creditors.

### I.   *Post-Petition Concealment of the Challenged Transactions*

86.     The Debtor and the Defendants actively and knowingly continued to conceal the transactions that the Debtor entered into with the Defendants and its insiders throughout the course of this bankruptcy case.

87.     The Debtor's voluntary petition for relief was accompanied by a corporate resolution authorizing the chapter 11 filing, which was signed by Mr. Muhammad and Mr. Ackah-Yensu in their capacity as managers of the Debtor.

88.     At all times relevant to this bankruptcy case, the Debtor was under the control of Mr. Ackah-Yensu and Mr. Muhammad.

89.     The Debtor filed its bankruptcy schedules and statement of financial affairs on July 28, 2023 (the "Schedules").  The Schedules were signed subject to penalty of perjury by Mark Cote, the Debtor's chief executive officer.

90.     The information contained in the Debtor's Schedules was provided by Mr. Ackah-Yensu, Mr. Muhammad, and other employees of the Defendants.

91.     The Debtor affirmatively stated subject to penalty of perjury that there were no transactions with or value given to insiders within either one or two years of the Petition Date in response to SOFA questions 4 (requiring the Debtor to disclose payments on debts owed to insiders within one year of the petition date), 13 (requiring the Debtor to disclose transfers made within two years of the petition date that were outside the ordinary course of business) and 30 (requiring the Debtor to disclose any value provided to an insider within 1 year of the petition date). (ECF No. 63 at 87, 90 & 95).

92.     The Debtor's Schedules were false and the Debtor and the Defendants knew that the information contained in the Schedules was false when they were filed.

93.     The Debtor filed amended Schedules on September 1, 2023 (the "Amended Schedules"). (ECF No. 80).  The Amended Schedules were signed subject to penalty of perjury by Mark Cote, the Debtor's chief executive officer.

94.     The information contained in the Debtor's Amended Schedules was provided by Mr. Ackah-Yensu, Mr. Muhammad, and other employes of the Defendants.

95.     The Debtor affirmatively stated subject to penalty of perjury that there was only one payment to the Defendants (an $8,000.00 payment to Axum Capital) within either one or two years of the Petition Date in response to SOFA questions 4 (requiring the Debtor to disclose payments on debts owed to insiders within one year of the petition date), 13 (requiring the Debtor to disclose transfers made within two years of the petition date that were outside the ordinary course of business) and 30 (requiring the Debtor to disclose any value provided to an insider within 1 year of the petition date). (ECF No. 63 at 92, 95 & 100).

96.     The Debtor failed to identify any other payments to the Defendants in response to SOFA questions 4, 13, and 30 in the Amended Schedules.

97.     The Debtor's Amended Schedules were false and the Debtor and the Defendants knew that the information contained in the Amended Schedules was false when they were filed.

98.     On September 9, 2023, the Official Committee of Unsecured Creditors (the "Committee") requested the Debtor to provide all documentation evidencing transactions the Debtor entered into with its owners and affiliates (including specifically the Defendants) prior to the Petition Date.

99.     The Committee specifically informed the Debtor that it did not believe that the Defendants should be involved in searching for and producing the responsive documents.

100.    Nevertheless, defendant Mr. Ackah-Yensu and Matt Mildenburg (an employee of the Defendants) participated in responding to the Committee's information requests.

101.    The Debtor provided only limited information and substantially failed to produce the documents and information requested by the Committee.

102.    On November 3, 2023, the Debtor filed a debtor in possession financing motion in which it sought to obtain a loan from Axum Fund I and to grant Axum Fund I a *pari passu* lien on virtually all assets of the Debtor (the "Insider DIP Loan Motion"). (ECF No. 170).

103.    The Debtor attempted to schedule the Insider DIP Loan Motion for an expedited approval hearing on November 7, 2023 (*i.e.*, 4 days' notice).

104.    The Insider DIP Loan Motion failed to disclose that Axum Fund I was paid the substantial sums of money identified in Exhibit 1 prior to the Petition Date.

105.    On January 2, 2024, the Debtor filed its first Disclosure Statement and proposed Plan of Reorganization.  (ECF No. 214).

106.    The Debtor's proposed Plan contemplated that all avoidance actions and causes of action would be retained by the Debtor—under the control of Mr. Ackah-Yensu and Mr. Muhammad—in order to shield the Defendants from potential liability to creditors.

107.    The Debtor's proposed disclosure statement failed to disclose any potential avoidance actions or any transfers to the Defendants or other insiders to further conceal the substantial transfers made to or for the benefit of the Defendants.

108.    On May 5, 2025, the Court entered an *Order on Motion Seeking the Production of Documents and Financial Records* (the "First Order"). [ECF No. 424].

109.    Pursuant to the First Order, the Debtor was directed to produce all documents evidencing transactions between the Debtor and its insiders and owners from its inception through the Petition Date.

110.    On May 12, 2025, the Court entered a second *Order on Motion Seeking the Production of Documents and Financial Records* (the "Second Order"). [ECF No. 429].

111.    Pursuant to the Second Order, defendants Tantum Holdings, Axum Capital, Axum Management and Axum Fund I were directed to produce "all documents evidencing transactions that they, or their affiliated entities, entered into with debtor Tantum Companies, LLC from the date of the Debtor's formation through the date of this order."

112.    The Debtor and the identified defendants (Tantum Holdings, Axum Capital, Axum Management and Axum Fund I) failed to produce all documents evidencing all transactions the Debtor entered into with its insiders and affiliates as ordered by the Court.

### J.   The Defendants are Alter Egos

113.    As discussed above, Mr. Ackah-Yensu and Mr. Muhammad operated the Debtor and the Corporate Defendants as part of a complex web of interrelated companies with a

multitude of bank accounts.  And, as discussed above, Mr. Ackah-Yensu and Mr. Muhammad used this complicated web of entities to transfer millions of dollars between the Debtor and the Corporate Defendants for their own benefit to the detriment of the Debtor's creditors.

114.    Mr. Ackah-Yensu and Mr. Muhammad exercised such complete domination and control over the financial affairs of the Corporate Defendants that the entities had no separate mind, will, or existence—they were merely alter egos of Mr. Ackah-Yensu and Mr. Muhammad and one another.

115.    Such domination and control consisted of, among other things, the following:

a.   Mr. Ackah-Yensu and Mr. Muhammad were signatories or controlled all bank accounts for the Corporate Defendants;

b.   Mr. Ackah-Yensu and Mr. Muhammad were officers, directors, managers and owners of the Corporate Defendants;

c.   Mr. Ackah-Yensu and Mr. Muhammad caused the Debtor and the Corporate Defendants to pay the expenses and debts of other affiliated entities;

d.   Mr. Ackah-Yensu, Mr. Muhammad and the Corporate Defendants failed to comply with corporate formalities, such as keeping accurate and complete corporate records, financial records, and shareholder minutes;

e.   The Corporate Defendants either had no other officers, directors or managers or no properly functioning officers, directors or managers to oversee Mr. Ackah-Yensu's and Mr. Muhammad's actions;

f.   Mr. Ackah-Yensu and Mr. Muhammad operated the Corporate Defendants from a common office and headquarters located in Charlotte, North Carolina;

MWH: 10800.001; 00031375.5                                18

g.  Mr. Ackah-Yensu executed and/or controlled the preparation of the respective state and federal tax returns on behalf of the Corporate Defendants; and

h.  Mr. Ackah-Yensu and Mr. Muhammad caused the Debtor, the Corporate Defendants, and other entities they own and control to transfer substantial amounts of money to and from each other, without adequate or accurate records tracking the transactions.

116.  In short, Mr. Ackah-Yensu and Mr. Muhammad operated the Corporate Defendants as a corporate shell game with no separate corporate existence.

### K. *Tolling Agreement and Equitable Tolling/Reservation of Rights*

117.  The Plaintiff and the Defendants entered into a *Tolling and Forbearance Agreement* and a *First Amendment to Tolling and Forbearance Agreement* effective as of June 16, 2025 (together, the "Tolling Agreement"), to toll the running of any time-related defenses and statute(s) of limitation.

118.  Pursuant to the Tolling Agreement, the Plaintiff and the Defendants agreed to toll the running of all applicable time-related defenses through and including October 15, 2025.

119.  Further, and to the extent that any of the Defendants allege that any statute of limitations has expired, the Defendants should be estopped from asserting any such defenses, and the Court should equitably toll the applicable limitations period.

120.  During his investigation into the Debtor, its financial affairs, and its transactions with insiders, the Plaintiff has discovered evidence illustrating that the true nature of various transactions were concealed or attempted to be concealed, not disclosed, or which appear to have been intentionally mischaracterized to disguise the true nature of the underlying transaction(s).

121.    Furthermore, the Plaintiff has acted diligently in conducting his investigation into the Debtor's financial affairs including, without limitation, seeking and obtaining the entry of multiple Court orders compelling the Debtor and the Defendants to account for the transactions they entered into with each other.

122.    During this adversary proceeding, Plaintiff may learn of additional facts that give rise to additional claims for relief against the Defendants or third parties.  The Plaintiff intends to pursue all such claims and to seek to avoid and recover all avoidable transfers that were made by the Debtor to the Defendants and any other third party.  Accordingly, in the event additional transactions or transfers are identified through discovery in this case, the Plaintiff expressly reserves the right to amend this Complaint to add additional claims or to seek to avoid and recover other transfers of property of the Debtor to the Defendants as part of this common scheme to strip assets from the Debtor for their own personal benefit.

**FIRST CLAIM FOR RELIEF**
Avoidance of Fraudulent Transfers
Pursuant to 11 U.S.C. § 544(b), 28 U.S.C § 3001 *et seq., and* 26 U.S.C. § 6502
(Actual Intent Fraudulent Transfer)

123.    Plaintiff realleges all paragraphs of this complaint and incorporates them by reference as if fully set forth herein.

124.    The Ten Year Transfers were made within ten (10) years of the Petition Date.

125.    The Ten Year Transfers were transfers of an interest of the Debtor in property.

126.    The Ten Year Transfers were made with the actual intent to hinder, delay, or defraud an entity or entities to which the Debtor was or became indebted, on or after the date that such transfers were made.

127.    The Debtor has unsecured creditors that could avoid the Ten Year Transfers, including the IRS.

128.    As a result, Plaintiff is entitled to avoid the Ten Year Transfers pursuant to 11 U.S.C. § 544(b), 28 U.S.C § 3001 *et seq.,* and 26 U.S.C. § 6502.

**SECOND CLAIM FOR RELIEF**
Avoidance of Fraudulent Transfers
Pursuant to 11 U.S.C. § 544(b), 28 U.S.C § 3001 *et seq., and* 26 U.S.C. § 6502
(Constructive Fraudulent Transfer)

129.    Plaintiff realleges all paragraphs of this complaint and incorporates them by reference as if fully set forth herein.

130.    The Ten Year Transfers were made within ten (10) years of the Petition Date.

131.    The Ten Year Transfers were transfers of an interest of the Debtor in property.

132.    The Debtor received less than reasonably equivalent value in exchange for the Ten Year Transfers.

133.    The Debtor was insolvent on the dates that the Ten Year Transfers were made or became insolvent as a result of such transfers.

134.    At the time of the Ten Year Transfers, the Debtor was engaged in business or a transaction, or was about to engage in business or transactions, for which any property remaining with the Debtor was an unreasonably small capital.

135.    At the time of the Ten Year Transfers, the Debtor intended to incur, or believed that the Debtor would incur, debts that were beyond the Debtor's ability to pay as such debts matured.

136.    The Debtor has unsecured creditors that could avoid the Ten Year Transfers, including the IRS.

137.    As a result, Plaintiff is entitled to avoid the Ten Year Transfers pursuant to 11 U.S.C. § 544(b), 28 U.S.C § 3001 *et seq.,* and 26 U.S.C. § 6502.

**THIRD CLAIM FOR RELIEF**
Avoidance of Fraudulent Transfers
Pursuant to 11 U.S.C. § 544(b) and N.C. Gen. Stat. § 39-23.1 *et seq*.
(Actual Intent Fraudulent Transfer)

138.    Plaintiff realleges all paragraphs of this complaint and incorporates them by reference as if fully set forth herein.

139.    The Four Year Transfers were made within four (4) years of the Petition Date.

140.    The Four Year Transfers were transfers of an interest of the Debtor in property.

141.    The Four Year Transfers were made with the actual intent to hinder, delay, or defraud an entity or entities to which the Debtor was or became indebted, on or after the date that such transfers were made.

142.    The Debtor has unsecured creditors that could avoid the Four Year Transfers, including the creditors: (i) identified in this complaint, (ii) listed in the Schedules, and (iii) that filed proofs of claim.

143.    As a result, Plaintiff is entitled to avoid the Four Year Transfers pursuant to 11 U.S.C. § 544(b) and N.C. Gen. Stat. § 39-23.1 *et seq*.

**FOURTH CLAIM FOR RELIEF**
Avoidance of Fraudulent Transfers
Pursuant to 11 U.S.C. § 544(b) and N.C. Gen. Stat. § 39-23.1 *et seq*.
(Constructive Fraudulent Transfer)

144.    Plaintiff realleges all paragraphs of this complaint and incorporates them by reference as if fully set forth herein.

145.    The Four Year Transfers were made within four (4) years of the Petition Date.

146.    The Four Year Transfers were transfers of an interest of the Debtor in property.

147.    The Debtor received less than reasonably equivalent value in exchange for the Four Year Transfers.

148.    The Debtor was insolvent on the dates that the Four Year Transfers were made or became insolvent as a result of such transfers.

149.    At the time of the Four Year Transfers, the Debtor was engaged in business or a transaction, or was about to engage in business or transactions, for which any property remaining with the Debtor was an unreasonably small capital.

150.    At the time of the Four Year Transfers, the Debtor intended to incur, or believed that the Debtor would incur, debts that were beyond the Debtor's ability to pay as such debts matured.

151.    The Debtor has unsecured creditors that could avoid the Four Year Transfers, including the creditors: (i) identified in this complaint, (ii) listed in the Schedules, and (iii) that filed proofs of claim.

152.    As a result, Plaintiff is entitled to avoid the Four Year Transfers pursuant to 11 U.S.C. § 544(b) and N.C. Gen. Stat. § 39-23.1 *et seq*.

### FIFTH CLAIM FOR RELIEF
Avoidance of Fraudulent Transfers
Pursuant to 11 U.S.C. § 548
(Actual Intent Fraudulent Transfer)

153.    Plaintiff realleges all paragraphs of this complaint and incorporates them by reference as if fully set forth herein.

154.    The Two Year Transfers were made within two (2) years of the Petition Date.

155.    The Two Year Transfers were transfers of an interest of the Debtor in property.

156.    The Two Year Transfers were made with the actual intent to hinder, delay, or defraud an entity or entities to which the Debtor was or became indebted, on or after the date that such transfers were made.

MWH: 10800.001; 00031375.5                    23

157. As a result, Plaintiff is entitled to avoid the Two Year Transfers pursuant to 11 U.S.C. § 548.

## SIXTH CLAIM FOR RELIEF
Avoidance of Fraudulent Transfers
Pursuant to 11 U.S.C. § 548
(Constructive Fraudulent Transfer)

158. Plaintiff realleges all paragraphs of this complaint and incorporates them by reference as if fully set forth herein.

159. The Two Year Transfers were made within two (2) years of the Petition Date.

160. The Two Year Transfers were transfers of an interest of the Debtor in property.

161. The Debtor received less than reasonably equivalent value in exchange for the Two Year Transfers.

162. The Debtor was insolvent on the dates that the Two Year Transfers were made or became insolvent as a result of such transfers.

163. At the time of the Two Year Transfers, the Debtor was engaged in business or a transaction, or was about to engage in business or transactions, for which any property remaining with the Debtor was an unreasonably small capital.

164. At the time of the Two Year Transfers, the Debtor intended to incur, or believed that the Debtor would incur, debts that were beyond the Debtor's ability to pay as such debts matured.

165. As a result, Plaintiff is entitled to avoid the Two Year Transfers pursuant to 11 U.S.C. § 548.

**SEVENTH CLAIM FOR RELIEF**
Avoidance of Unauthorized Post-Petition Transfers
Pursuant to 11 U.S.C. § 549

166.    Plaintiff realleges all paragraphs of this complaint and incorporates them by reference as if fully set forth herein.

167.    The transfers listed in Exhibit 1 that occurred on or after June 26, 2023 (the "Post-Petition Transfers") were made after the Petition Date.

168.    The Post-Petition Transfers were not authorized by the Bankruptcy Code or by the Court.

169.    As a result, Plaintiff is entitled to avoid the Post-Petition Transfers pursuant to 11 U.S.C. § 549.

**EIGHTH CLAIM FOR RELIEF**
Recovery of Transfers
Pursuant to 11 U.S.C. § 550

170.    Plaintiff realleges all paragraphs of this complaint and incorporates them by reference as if fully set forth herein.

171.    The Ten Year Transfers, Four Year Transfers, Two Year Transfers and the Post-Petition Transfers (collectively, the "Transfers") are avoidable pursuant to 11 U.S.C. §§ 544, 548 & 549, and applicable state and federal law.

172.    The Defendants were the initial transferees of one or more of the Transfers or the person or entity for whose benefit such Transfers were made.

173.    Alternatively, the Defendants were the immediate or mediate transferee of such initial transferees.

174.    As a result, the Plaintiff is entitled to recover the Transfers or their value from the Defendants pursuant to 11 U.S.C. § 550(a).

## NINTH CLAIM FOR RELIEF
Alter Ego Remedy/Piercing the Corporate Veil

175. Plaintiff realleges all paragraphs of this complaint and incorporates them by reference as if fully set forth herein.

176. At all times relevant to the allegations in this Complaint, Mr. Ackah-Yensu and Mr. Muhammad exercised complete dominion and control over the Corporate Defendants.

177. Mr. Ackah-Yensu and Mr. Muhammad operated the Corporate Defendants as if the corporate entities had no separate corporate existence.

178. Mr. Ackah-Yensu and Mr. Muhammad used their control of the Corporate Defendants to commit frauds against the Debtor's creditors in order to violate positive legal duties, and they took dishonest acts in contravention of the legal rights and the Debtor's creditors.

179. The Debtor's creditors were directly and proximately harmed by Mr. Ackah-Yensu's and Mr. Muhammad's use of the Corporate Defendants as vehicles to commit frauds against the Debtor's creditors.

## TENTH CLAIM FOR RELIEF
Unfair and Deceptive Trade Practices
Pursuant to 11 U.S.C. § 544(a) & (b) and N.C. Gen. Stat. § 75-1.1 *et seq*.

180. Plaintiff realleges all paragraphs of this complaint and incorporates them by reference as if fully set forth herein.

181. The Defendants perpetrated a scheme to hinder, delay or defraud the Debtor's creditors by running the Debtor for years in a state of perpetual insolvency while engaging in self-interested and unfair transactions and siphoning off funds including, without limitation, making the unlawful Transfers.

182. At all times herein, the Defendants' actions were in or affecting commerce.

183.    The Defendants' actions alleged herein were unfair and deceptive acts or practices in violation of N.C. Gen. Stat. § 1-75.1 *et seq.* (the "Unfair Trade Practices Act").

184.    The Debtor's creditors were damaged as a direct and proximate result of the Defendants' unfair and deceptive trade practices.

185.    Pursuant to 11 U.S.C. § 544(a), the Plaintiff has, among other things, the rights and powers of a hypothetical lien or judgment creditor of the Debtor.

186.    Under North Carolina law, creditors have the rights and powers to pursue remedies and damages under the Unfair Trade Practices Act against the Defendants based on the Defendants' scheme to fraudulently transfer assets.

187.    Pursuant to 11 U.S.C. § 544(b), and as alleged above, the Debtor has unsecured creditors that could avoid the Transfers and pursue claims under the Unfair Trade Practices Act, including the IRS, NC DOR, TN DOR, MS DOR, the creditors identified in the Schedules and the creditors that filed proofs of claim in this case.

**WHEREFORE**, the Plaintiff respectfully prays the Court to:

1.    Enter a judgment against the Defendants on all applicable causes of action alleged in the Complaint;

2.    Enter a judgment piercing the corporate veil and finding that the Defendants are alter egos of one another;

3.    Enter an award of punitive damages and/or treble damages on all claims for which such damages are properly asserted;

4.    Enter injunctive and other equitable relief to prevent the Defendants from transferring, dissipating, concealing, secreting, encumbering, or otherwise disposing of assets;

5.      Enter a judgment awarding the Plaintiff the costs incurred in pursuing this action, together with all expenses and attorneys' fees to the extent permitted by applicable law; and

6.      Award the Plaintiff such other and further relief as the Court deems just and proper.

Dated: Charlotte, North Carolina
       October 15, 2025

                                    **MOON WRIGHT AND HOUSTON, PLLC**

                                    ___/s/ *Andrew T. Houston*___
                                    Andrew T. Houston (NC Bar No. 36208)
                                    ahouston@mwhattorneys.com
                                    Caleb Brown (NC Bar No. 41131)
                                    cbrown@mwhattorneys.com
                                    212 N. McDowell Street, Suite 200
                                    Charlotte, North Carolina 28204
                                    Telephone: (704) 944-6560
                                    Facsimile:  (704) 944-0380
                                    *Counsel for the Plaintiff / Liquidating Trustee*

# Exhibit 1

| Date | Amount | Recipient/Beneficiary |
|---|---|---|
| 5/23/2018 | $236,557.30 | Axum Fund I |
| 6/8/2018 | $119,619.75 | Axum Fund I |
| 7/12/2018 | $6,740.13 | Axum Fund I |
| 8/22/2018 | $33,123.99 | Axum Fund I |
| 10/4/2018 | $7,534.50 | Axum Fund I |
| 12/20/2018 | $2,360.00 | Axum Fund I |
| 2/8/2019 | $1,545.00 | Axum Fund I |
| 4/5/2019 | $19,250.23 | Axum Fund I |
| 12/9/2019 | $4,672.48 | Tantum Holdings |
| 1/7/2020 | $4,672.48 | Tantum Holdings |
| 2/7/2020 | $4,672.48 | Tantum Holdings |
| 3/9/2020 | $4,672.48 | Tantum Holdings |
| 3/9/2020 | $7,737.93 | Axum Fund I |
| 3/17/2020 | $10,000.00 | Axum Fund I |
| 4/7/2020 | $4,672.48 | Tantum Holdings |
| 4/24/2020 | $27,660.00 | Axum Fund I |
| 4/26/2020 | $25,000.00 | Axum Capital |
| 4/26/2020 | $2,660.00 | Axum Capital |
| 4/29/2020 | $39,922.01 | Axum Fund I |
| 5/7/2020 | $4,672.48 | Tantum Holdings |
| 5/15/2020 | $38,422.61 | Axum Fund I |
| 5/24/2020 | $653.94 | Axum Capital |
| 5/24/2020 | $672.92 | Axum Capital |
| 5/24/2020 | $16,164.57 | Axum Capital |
| 5/24/2020 | $22,430.58 | Axum Capital |
| 5/24/2020 | $6,827.34 | Axum Capital |
| 5/24/2020 | $870.50 | Axum Capital |
| 5/24/2020 | $24,905.80 | Axum Capital |
| 5/24/2020 | $5,819.00 | Axum Capital |
| 6/8/2020 | $4,672.48 | Tantum Holdings |
| 7/7/2020 | $4,672.48 | Tantum Holdings |
| 7/31/2020 | $41,225.60 | Axum Fund I |
| 8/6/2020 | $34,320.42 | Tantum Holdings |
| 9/9/2020 | $34,320.42 | Tantum Holdings |
| 10/9/2020 | $38,731.99 | Tantum Holdings |
| 11/9/2020 | $40,017.56 | Tantum Holdings |
| 12/8/2020 | $40,017.56 | Tantum Holdings |
| 12/15/2020 | $17,250.00 | Axum Fund I |
| 12/21/2020 | $290,000.00 | Axum Fund I |
| 12/21/2020 | $412,000.00 | Axum Fund I |
| 12/27/2020 | $44,942.00 | Axum Management |
| 1/6/2021 | $97,346.00 | Axum Fund I |
| 1/8/2021 | $40,017.56 | Tantum Holdings |

| Date | Amount | Entity |
|---|---|---|
| 2/4/2021 | $48,597.58 | Aetius Holdings |
| 2/9/2021 | $40,017.56 | Tantum Holdings |
| 3/9/2021 | $40,017.56 | Tantum Holdings |
| 3/11/2021 | $23,000.00 | Axum Fund I |
| 4/6/2021 | $40,251.48 | Tantum Holdings |
| 6/4/2021 | $30,799.30 | Aetius Holdings |
| 6/8/2021 | $83.43 | Axum Management |
| 6/29/2021 | $10,336.76 | Aetius Holdings |
| 8/13/2021 | $17,706.25 | Axum Fund I |
| 10/7/2021 | $0.01 | Axum Fund I |
| 10/13/2021 | $6,634.00 | Axum Fund I |
| 10/20/2021 | $5,000.00 | Axum Fund I |
| 10/20/2021 | $1,586.00 | Axum Fund I |
| 11/24/2021 | $180,000.00 | Axum Fund I |
| 12/16/2021 | $300,000.00 | Axum Fund I |
| 12/23/2021 | $126,000.00 | Axum Fund I |
| 3/10/2022 | $200,000.00 | Axum Fund I |
| 6/10/2022 | $92,000.00 | Axum Fund I |
| 7/13/2022 | $101,000.00 | Axum Fund I |
| 8/4/2022 | $16,000.00 | Axum Fund I |
| 8/29/2022 | $175,000.00 | Axum Fund I |
| 9/30/2022 | $56,176.13 | Tantum Holdings |
| 2/1/2023 | $63,026.40 | Tantum Holdings |
| 8/30/2023 | $704.49 | Aetius Holdings |
| 8/30/2023 | $1,000.13 | Aetius Holdings |
| 8/31/2023 | $354.85 | Aetius Holdings |
| | $3,399,338.98 | |